IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 11-cv-00157-RPM

QWEST COMMUNICATIONS INTERNATIONAL, INC.,

    Plaintiff,

v.

QBE CORPORATE LTD;
CATLIN SYNDICATE LIMITED;
ACE CAPITAL IV LIMITED;
ACE CAPITAL LTD;
ACE CAPITAL V LIMITED;
HARDY UNDERWRITING LIMITED,

    Defendants.

---

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Qwest Communications International, Inc. (Qwest) seeks payment from the defendants who are responsible parties as insurers under a Primary Commercial Crime Policy for the costs of defense and the amount paid for settlement of claims made by Vietnam Telecom International (VTI) based on fraud, negligent misrepresentation and unfair business practices resulting from dishonest conduct of two Qwest employees, Eddie Inyang and Jose Hospidales. Those claims were made in an action filed in 2006 in the Superior Court of California, County of Los Angeles, Case No. BC364137, naming Qwest, Inyang, Hospidales, Richard Nguyen and Eric Lewis as defendants. Nguyen and Lewis were sued for their actions as principals in NetGlobal, LLC, a California limited liability company, which contracted with VTI for international

telecommunications between the United States and the Socialist Republic of Vietnam. While the claims against Qwest were never adjudicated, there is no dispute that Hospidales and Inyang, while employed by Qwest, engaged in an elaborate scheme to induce VTI to believe that Qwest was a business partner with NetGlobal with liability for its indebtedness to VTI.

It is not necessary to recount the details of the deceptions practiced by Inyang and Hospidales in fraudulently inducing VTI to enter into a Memorandum of Understanding between VTI and "Qwest/NetGlobal" in November, 2001 to establish a Voice over Internet Protocol (VoIP) network. That document was signed by Inyang for NetGlobal and by Hospidales as "Market Development Senior Executive" for Qwest. Hospidales did not have that title and did not have contracting authority from Qwest. It is assumed that this agreement would not have been made if VTI had known that Qwest was not equally responsible with NetGlobal for performance of it.

On June 6, 2002, VTI and NetGlobal signed a service agreement, signed by Inyang for NetGlobal. Qwest was not a signatory party but Inyang, describing himself as a vice-president of NetGlobal, had given written assurance of a partnership with Qwest.

Services were provided pursuant to that agreement and some later modifications and during the next two years NetGlobal met all of its obligations, making payments of approximately $20 million for call traffic originating in the United States and terminating in Vietnam.

In 2003, Nguyen and Lewis began transferring NetGlobal's funds to various family members and companies controlled by them. Nguyen transferred his interest in NetGlobal to

Inyang (who, by this time, was no longer a Qwest employee). Inyang eventually became NetGlobal's President and sole or majority owner.

In approximately April 2004, NetGlobal defaulted on its payment obligations to VTI. In January 2005, VTI shut down the VoIP network. VTI attempted to collect NetGlobal's payment obligations from NetGlobal, but those efforts were unsuccessful.

In December 2006, VTI filed suit against Qwest, Inyang, Hospidales and others, seeking approximately $50 million in damages, consisting of accounts receivable from NetGlobal and late charges.

In November 2009, Qwest submitted a proof of loss to the Defendants, seeking coverage under the Policy for losses relating to the VTI lawsuit. The Defendants denied the claim and refused to participate in settlement negotiations between Qwest and VTI. In May 2010, Qwest settled the VTI lawsuit.

The defendants moved for summary judgment of dismissal, presenting the questions of coverage under the terms of the insurance policy.

Coverage Form A provides, "We will pay for loss of, and loss from damage to, Covered Property *resulting directly* from the Covered Cause of Loss." (Policy at p. 14, Employee Dishonesty Coverage Form A, § A, emphasis added.) In Coverage Form A, the Covered Cause of Loss is "Employee Dishonesty."

"Employee dishonesty" is defined as dishonest acts committed by an "employee," . . . with the intent to:

(1)    cause [the Insured] to sustain loss; or

>  (2) obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:
>     (a) The "employee"; or
>     (b) Any person or organization intended by the "employee" to receive that benefit.

(Policy at p. 15, Coverage Form A, § D(3)(a).)

In Coverage Form A, "Covered Property" is defined as "money, securities, and property other than money and securities." (*Id.*, § A.1.)

General Condition 13 states:

> The property that is covered under this insurance is limited to property:
> a. That you own or hold; or
> b. For which you are legally liable.
> However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization.

(Policy at pp. 10-11.)

General Exclusion 3 excludes coverage for a loss that is:

> *an indirect result* of any act or "occurrence" covered by this insurance including, but not limited to, loss resulting from:
> . . .
> b. Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this Insurance.

(Policy at p. 8, Crime General Provisions, § A.3.b.)

An extension of coverage provides:

> We will pay for all reasonable and necessary legal fees, costs and expenses incurred and paid by you in the defence of any demand, claim, suit or legal proceeding with respect to which you establish that the act or acts which were committed would entitle you to recover under this Policy if any loss resulted therefrom.

(Policy at p. 50, Legal Expenses and Investigative Expenses Extension.)

It is undisputed that Inyang and Hospidales engaged in acts of dishonesty as employees of Qwest. The question is whether the Policy provides coverage for Qwest's settlement payment to VTI, which resolved claims of vicarious liability for the Qwest employees' perpetration of fraud on VTI.

The Defendants contend that the settlement payment is not a loss that resulted directly from employee dishonesty and is not a covered property loss.

The Plaintiff argues that the Colorado Supreme Court would apply proximate cause analysis to determine whether an insured's loss resulted directly from employee dishonesty. The Plaintiff states that an average purchaser of insurance would assume that the term "direct" would be construed to mean "proximate cause." The Plaintiff also argues the Policy provides coverage for an insured's liability for third party claims, pointing to the extension that provides $500,000 of coverage for legal and investigative fees. The Plaintiff contends that General Exclusion 3.b does not exclude coverage for the Plaintiff's claimed loss, characterizing that language as circular.

Commercial crime policies are not intended to be liability policies. Coverage Form A provides coverage only for losses that result *directly* from employee dishonesty. That provision is consistent with General Exclusion 3, which excludes losses that are an *indirect* result of employee dishonesty. Under General Condition 13, coverage is extended only to property that the insured owns or holds or property for which the insured is legally liable.

The VTI lawsuit did not involve property owned or held by the Plaintiff or property for which it had legal liability. The phrase "property for which [the insured] is legally liable" refers to an interest that exists apart from a third party's claim of employee dishonesty. Thus, for

example, coverage has been found when employee dishonesty results in the loss of a third party's property under the control of the insured. *See, e.g., Nelson v. ITT Hartford Fire Ins. Co.*, No. 99-6275, 216 F.3d 1088 (10th Cir. June 13, 2000) [unpublished] (finding coverage for loss resulting from real estate company employees' misappropriation of clients' escrowed funds); *Rothschild Invst. Corp., v. Travelers Cas. & Sur. Co.*, No. 05 C-3041, 2006 WL 1236148 (N. D. Ill. May 4, 2006) (finding coverage for loss resulting from employee's embezzlement of funds held by employer (a registered broker dealer) for the benefit of others). That type of interest or legal liability is different from the vicarious liability that arises from an employee's perpetration of fraud on a third party. "Mere insertion of the words 'legal liability' into an employee dishonesty policy does not transform the policy into a liability policy." *Lynch Properties, Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 629 (5th Cir. 1998).

   The Policy extension that provides coverage for certain legal and investigative fees is not a blanket third party claims clause. The language of the indirect loss exclusion, which generally excludes coverage for an insured's payment of damages, is not circular.

   The Plaintiff's proposed construction would eliminate the distinction between a direct loss and an indirect loss and would transform the policy into a liability policy.

   Even under a proximate cause analysis, there are intervening causes between the fraudulent inducement of the service agreement and the failure to pay the amounts due after April, 2004. It has been suggested that the failure resulted from looting of NetGlobal. Whether that is true, the fact is that the agreement had been performed by NetGlobal for two years and Qwest's liability would be based on a contract to which it was not a party. Under any theory of causation for non-payment to VTI, it did not result from the dishonest acts of Inyang and

Hospidales while they were employed by Qwest.  Hospidales' employment with Qwest ended in May 2002.  Inyang's employment with Qwest had ended by November 2002.

Upon the foregoing, it is

ORDERED, that judgment will enter for the defendants, dismissing this civil action and awarding costs.

Dated:  November 4, 2011

BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge